UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

UNITED STATES OF AMERICA

v.

Case No. 3:20-CR-86-TJC-JBT

JORGE PEREZ, et al.,

Defendants.

### AFFIDAVIT OF JORGE PEREZ IN SUPPORT OF HIS MOTION FOR NEW TRIAL BASED ON NEWLY DISCOVERED EVIDENCE PURSUANT TO FED.R.CRIM.P. 33(b)

This affidavit is filed in support of Jorge Perez's Motion for New Trial Based on Newly Discovered Evidence Pursuant to Fed.R.Crim.P. 33(b).

1. I am a defendant in this case. I have personal knowledge of the factual matters set out in the Motion for New Trial Based on Newly Discovered Evidence (except as noted hereinbelow). Those facts are true to the best of my knowledge and belief.

2. Before trial actually began in this case, I was confused and uncertain about the government's allegations of criminal wrongdoing. The original indictment was vague, non-specific, and lacked details. I came to understand we were alleged to have defrauded the insurance companies by submitting billing claims for urine testing of patients that had no connection with the hospitals and that the billing company disguised this conduct by placing the "code 22" on the claims, which denoted "outpatient." That was not true. The billing company placed a "code 141" on the UB-04 or 837I forms denoting "non-patients." The insurance companies changed that to "code 22" when processing the claim forms. It is not possible to place a "code 22" on the UB-04 or the 837I forms at all.

1

3. I also came to understand the government alleged the hospitals had billed for testing that was not "medically necessary." That was also wrong. Each doctor's requisition for testing was accepted as the doctor's judgment that the ordered tests were medically necessary. In its Compliance Program Guidance for Clinical Laboratories, the Office of Inspector General for the Dept. of HHS stated, "We recognize that laboratories do not and cannot treat patients or make medical necessity determinations."

4. Later, I came to understand that the government contended the hospitals were merely shells that performed little or no testing on the specimens because they lacked the capacity and personnel, but had submitted claims as if all of the testing was performed there. That was also not true. CGH and RGH had laboratories and had performed testing there for years. Putnam was unable to test for a few months in 2017, but regained that capacity and resumed testing.

5. During the pretrial hearing on April 29, 2022, Mr. Winters shifted the government's theory again. He acknowledged that the hospitals had performed a significant number of tests, but then said the hospitals mostly billed for confirmation testing even though they lacked the capability to do them. I did not attach any importance to that because I had heard several other conjectures that were not true, and I knew this one was also false.

6. It was during Mr. Duva's opening statement that I first heard the government's newest theory that the overwhelming majority of the hospitals' claims were for confirmation tests done at the labs because the hospitals could not perform them. It was then that I understood the government intended to prove that new contention as an

2

additional or alternate theory. My lawyer and I were not prepared to investigate and defend against this theory or to find an expert to help us.

7. Before trial, the government had provided copies of the CDs containing massive bits of billing data, such as Exhibits 1A, 1B, 1C, 1D, 1E, 1F, etc., and excerpts or "call-outs" from those such as 1A(1), 1B(1), 1C(1), 1D(1), etc. These were spreadsheets the insurance companies had created and compiled at the government's request. This data was grouped into many columns showing various types of information. Column J on the UHC spreadsheet listed CPT codes, and column K contained descriptors for them; for Aetna, the CPT codes were listed in column AX and the descriptors in column AY. But I am not a trained or certified coder and cannot compare the five-digit code with the descriptor to determine their accuracy or whether they correspond appropriately. Our company, Empower HIS, retained a coder who had 20+ years of experience in coding lab billing claims (Jose Salazar and his company, JVS Billing) to handle the coding and billing. I could not have detected any useful information from studying these government exhibits before or during trial. My lawyer, Thomas Bell, was not a trained or certified coder, either. During the time he represented me, I observed nothing that gave me the impression he was able to understand CPT codes or coding other than at a basic level.

8. We also received Dr. Waller's two-page supplemental report on April 15, 2022, but not access to the SQL Server database he mentioned in his report containing all of the insurance companies' data on GExh. 1A through 1M. The queries Dr. Waller used in forming his opinions were also not provided to us before or during the trial.

3

9. We did not get access to that database or the queries until February 2023, so before and during the trial we had no ability to search the SQL database to attempt to replicate Dr. Waller's methodology or verify the accuracy of the conclusions he testified to at trial.

10. Also, we were never told, before, during or after trial, how Dr. Waller was able to discern which five-digit CPT codes matched either screening tests or confirmations for use in his queries, such as a document, map, or legend. And we were never given any such document or information so that we could search the SQL database independently.

11. In 2016 after the insurance companies placed CGH on "prepayment review," ceased paying claims submitted and clawed back amounts previously paid, CGH went into bankruptcy. All ties between myself and CGH were terminated in mid-2016. In early 2017 the FBI subpoenaed and took possession of some of its computer equipment including the server and external storage drive. These contained the Laboratory Information System (LIS). On the LIS were the results from the tests run on the machines located within that hospital. The LIS shows what particular machine within the hospital was used to perform each test, and the identity of the operator. The LIS would prove the hospitals ran only screening tests on the urine samples. We did not get access to that hard drive until soon after April 21, 2022, when the government produced a copy for trial. Had we been able to search that drive and analyze the data along with Dr. Waller's SQL database and his queries, we could have determined the ratio of screens versus confirmations and effectively cross-examined government witnesses Tobin,

4

Shohan, Dr. Waller and Parks, just as defense counsel had done in the Durall trial when armed with this information.

12. During the trial we were required to focus much of our attention on refuting the other conjectures the government continued to push throughout the trial in questioning its witnesses -- that the hospitals had deceived the insurance companies by using their own NPI number and tax ID for testing done at independent labs, by placing the 22 code on UB-04 or 837I claim forms, by billing for medically unnecessary tests, by submitting claims that omitted mention of the labs, and by using the hospitals as shells for billing when they lacked the capability to perform lab tests.

13. Kelly Tobin from United Healthcare, the government's first witness, identified Exh. 1A and 1A(1) as UHC's claims data reflecting billings submitted by CGH. She was the first witness to testify that the majority of tests shown on 1A(1) were for confirmations. At that point, I could not verify the truth of her testimony because of my lack of knowledge about CPT codes and descriptors. We could not seek assistance from an expert in that field.

14. When Garrett Shohan testified for Aetna that the majority of tests billed by CGH, RGH and Putnam were for confirmations, I could not verify the truth of his testimony for the same reasons.

15. We received both the original expert report from Dr. Clark promptly after she created it and the supplemental report from Dr. Waller before trial (see the Ricardo Perez affidavit, Att. A and B). But neither report disclosed any opinion about the ratio of

5

screening tests to confirmatory tests, or that any inquiry or investigation was made into that subject.

16. In November and December 2022, we received proposed spreadsheet exhibits the government apparently intended to offer in the Durall trial that were somewhat different from those used in our trial. In February 2023, shortly before the Durall trial began, we received the SQL database and Dr. Waller's queries.

17. Ricardo Perez compared and analyzed all of this information together and determined that Dr. Waller's testimony in the Perez trial was false and inaccurate and was able to identify the flaws in Dr. Waller's methodology and conclusions.

18. In fact, the data showed that the vast majority of billing claims involved screening tests performed at the hospitals, not confirmations done at laboratories. Many of the CPT codes the government witnesses interpreted as confirmations actually were for screens. Ricardo is prepared to prove to the Court at a hearing, utilizing the SQL database and his queries, the flaws in Dr. Waller's approach and analysis, leading to the inaccuracies in the results he obtained and the errors in his conclusions. For example, Dr. Waller never utilized the *descriptors* that appear on the government's spreadsheets in a query to extract information about whether tests were screens or confirmations.

19. Using the SQL database, Ricardo Perez also determined that the testimony of Kelly Tobin and Garrett Shohan in the Perez trial was false and inaccurate as well with respect to their statements that the majority of tests shown in the UHC and Aetna spreadsheets were for confirmations. He also determined that the testimony of Melissa Parks that "a lot more codes for definitive than for presumptive" were shown on the

spreadsheets of UHC, Aetna and Florida Blue was also false and inaccurate. Ricardo Perez is prepared to explain this to the Court at a hearing.

**FURTHER AFFIANT SAYETH NAUGHT.**

_____
JORGE A. PEREZ

STATE OF GEORGIA      )
COUNTY OF FULTON   )

SWORN TO and SUBSCRIBED BEFORE me in person by JORGE A. PEREZ, who is personally known to me or who provided Drivers License as proof of identity this 31 day of May, 2024.

_____   SEAL:
NOTARY PUBLIC STATE OF GEORGIA

[Notary Seal: COREY LADD, NOTARY, EXPIRES GEORGIA October 6, 2025, PUBLIC, FULTON COUNTY]